1   MITCHELL CHYETTE [113087]
    Law Office of Mitchell Chyette
2   125 12th Street
    Suite 100-BALI
3   Oakland, CA 94607
    Telephone: (510) 388-3748
4   Email: mitch@chyettelaw.com
    Attorney for Amy Burke, Lawrence Maravilla, and the putative class
5
    [Additional Counsel listed below]
6

7                    UNITED STATES DISTRICT COURT

8                    EASTERN DISTRICT OF CALIFORNIA

9

10  AMY BURKE AND LAWRENCE               Case No.
    MARAVILLA,
11                                       **COMPLAINT FOR DAMAGES AND
              Plaintiffs,                JURY DEMAND**
12
         vs
13
    WELLS FARGO BANK, N.A.,
14
              Defendant.
15

16

17

18

19

20

21

22

23
                    COMPLAINT FOR DAMAGES AND JURY DEMAND
24                  *Burke and Maravilla v. Wells Fargo Bank, N.A.,*
                                    Case No.

Plaintiffs AMY BURKE and LAWRENCE MARAVILLA ("Plaintiffs"), through their Counsel, bring this class action lawsuit on behalf of themselves and all other persons similarly situated, and for their Class Action Complaint against Defendant WELLS FARGO BANK, N.A., Plaintiffs allege with personal knowledge with respect to themselves individually and on information and belief derived from, among other things, investigation of counsel and a review of public documents as to all other matters, as follows:

## I.    NATURE OF THE CASE

1.    This case seeks recourse for the hundreds of borrowers who suffered damages as a result of Wells Fargo Bank, N.A.'s ("Defendant's") "calculation errors," which stemmed from a common cause, and resulted in Defendant wrongfully failing to offer a trial loan modification to hundreds, if not thousands, of homeowners.

2.    Defendant is one of the largest financial institutions in America and one of the nation's largest residential home mortgage servicers. Among other things, Defendant provides mortgage loan modification services to consumers who have defaulted on their mortgage.

3.    Defendant uses mortgage loan modification tools to create automated calculations and to determine whether consumers in default are eligible for loan modifications under Government Sponsored Enterprise ("GSE") and other federal agency requirements.

4.    Between 2010 and 2018, Defendant failed to detect or ignored multiple systematic errors in its automated decision-making software. This software

determined customers' eligibility for a government-mandated mortgage modification during a time of extreme financial distress. Its importance to these customers' lives cannot be overstated. Yet, Defendant failed to adequately test, audit, and verify that its software was correctly calculating whether customers met threshold requirements for a mortgage modification. Defendant further failed to regularly and properly audit the software for compliance with government requirements—allowing life-changing errors to remain uncorrected for years.

5.     As a result of Defendant's deficient auditing and compliance procedures, Defendant repeatedly violated the Home Affordable Modification Program ("HAMP") and other government statutes, regulations, and enforcement orders over a period of at least eight years. By this conduct, Defendant denied Plaintiffs and other Class members trial mortgage modifications that Defendant was legally required to offer.

6.     To make matters worse, even after discovering the 2013 error, Defendant continued using the faulty mortgage modification software to assess borrowers' eligibility for modification options for more than two years. Defendant did not implement new controls until October of 2015. And it did not disclose the error to federal regulators or the public until August of 2018.

7.      Moreover, despite discovering the error in 2013 and allegedly implementing new controls in 2015, Defendant still did not reform its auditing and verification practices. Related errors that would affect hundreds of additional borrowers were not discovered, remedied, or disclosed until 2018.

COMPLAINT FOR DAMAGES AND JURY DEMAND
*Burke and Maravilla v. Wells Fargo Bank, N.A.*,
Case No.

8.    Defendant's failure to implement adequate auditing and compliance procedures was not an accident. As scandal after scandal comes to light, it has become all too clear that Defendant and its parent company intentionally abandoned their oversight responsibilities—and did so to a shocking degree. And, until they were caught red-handed, they concealed those failures.

9.    Defendant's persistent failure to implement adequate auditing and compliance procedures has grown so flagrant and resulted in so many consumer abuses that, in February 2018, the Federal Reserve Board announced through a formal Cease and Desist Letter that it would prohibit Defendant's parent company from expanding its business until it sufficiently improved its governance and controls.

10.    During his testimony on March 12, 2019, in the United States House of Representatives Financial Services Committee, former Wells Fargo CEO Timothy Sloan admitted the fundamental allegations of this Complaint: that due to the Bank's actions or inactions, hundreds (later revealed to be thousands), of customers were improperly denied a loan modification between 2010 and 2015, and that over 500 of those had lost their homes to foreclosure. And he also admitted that Wells Fargo did not disclose to those victims that they had been injured through no fault of their own until late 2018.

11.    The subsequent identification of additional affected borrowers whose trial mortgage modifications were denied because of Wells Fargo's errors, but who were not foreclosed upon by Wells Fargo, brings the total number of Class members to approximately 1,830.

## II.    PARTIES

<u>Representative Plaintiffs Lawrence Maravilla and Amy Burke</u>.

12.    LAWRENCE MARAVILLA and AMY BURKE are each natural persons and citizens of California residing in Placer County, California ("Plaintiffs" or individually "Maravilla" and "Burke"). Plaintiffs owned certain real property located at 10368 Bexhill Place, Truckee, CA 96161 (the "Property") from July 10, 2005, until on or about June 20, 2014, when due to the admittedly erroneous actions of Wells Fargo, the Plaintiffs were forced to sell the Property via a short sale.

<u>Defendant Wells Fargo Bank, N.A</u>.

13.    WELLS FARGO BANK, NATIONAL ASSOCIATION is a federally chartered National Banking Association that is organized and exists under the National Banking Act, with its principal place of business located in Sioux Falls, South Dakota ("Defendant"). Defendant is subject to the supervision of the Comptroller of the Currency of the United States Department of the Treasury and is deemed a citizen of South Dakota pursuant to 28 U.S.C. § 1348.

14.    Defendant executed contracts across the United States and in the State of California including the loans at issue with the Property in Nevada County, California. Defendant regularly engages and transacts substantial business across the State of California.

## III.    JURISDICTION AND VENUE

15.    This Court has subject matter jurisdiction over this action under 28 U.S.C. § 1332(d) because at least one member of the Class is a citizen of a state

COMPLAINT FOR DAMAGES AND JURY DEMAND
*Burke and Maravilla v. Wells Fargo Bank, N.A.,*
Case No.

1  different from Defendant, there are more than 100 members of the Class, and the

2  aggregate amount in controversy exceeds $5 million exclusive of interests and costs.

3       16.    This Court has personal jurisdiction over Defendant. In addition to the

4  substantial business Defendant conducts in California, Plaintiffs' contract with

5  Defendant was executed in the Eastern District of California regarding real property

6  located in the Eastern District of California.

7       17.    This District is the proper venue for this action as Defendant resides in

8  the District for purposes of 28 U.S.C. § 1391(b)(1) or (c) and because the Property is

9  in the Southern District of Ohio for purposes of 28 U.S.C. § 1391(b)(2).

10  **IV.   COMMON FACTUAL ALLEGATIONS**

11       18.    Plaintiffs, on behalf of themselves and all similarly situated persons,

12  seek to recover statutory damages, punitive damages, and actual damages resulting

13  from Defendant's wrongful conduct in connection with Plaintiffs' and Class members'

14  residential mortgage loans.

15  **A.    Defendant services residential mortgage loans nationwide.**

16       19.    Defendant is one of the nation's largest providers of residential home

17  mortgage loans. It services, and at all times relevant hereto has serviced, residential

18  home mortgage loans nationwide.

19       20.    Defendant is a loan servicer and lender. It derives income in a number

20  of ways including (a) payments based on a percentage of each borrower's principal

21  balance pool, (b) float interest, (c) late fees, (d) foreclosure fees, (e) property inspection

22  and preservation fees, and (f) broker opinion fees.

23

24

21.    Defendant is a wholly-owned and controlled subsidiary of Wells Fargo & Company (NYSE: WFC), one of the nation's largest financial institutions. Wells Fargo & Company is a Delaware corporation headquartered in San Francisco, California, and a registered bank holding company.

22.    Wells Fargo & Company describes itself as a "diversified, community-based financial services company with $1.87 trillion in assets." *Wells Fargo & Company*, Quarterly Report Pursuant to Section 13 or 15(d) of the Securities Exchange Act of 1934 (Form 10-Q), p. 3, (Nov. 6, 2018). It provides "banking, investment, and mortgage products and services as well as consumer and commercial finance, through 8,050 locations, 13,000 ATMs, digital (online, mobile, and social), and contact centers (phone, email, and correspondence)." *Id*. Wells Fargo & Company employs approximately 262,000 full-time employees in 37 countries and serves "one in three households in the United States." *Id*.

**B.    Defendant employs uniform, nationwide loan servicing, loan modification, and foreclosure practices.**

23.    Defendant utilizes uniform and standardized loan servicing, loan modification, and foreclosure practices nationwide. Much of Defendant's uniform and standardized loan servicing, loan modification, and foreclosure practices are reliant upon automated processes, systems, and tools.

24.    Defendant's loan servicing, loan modification, and foreclosure practices are governed by federal requirements and obligations.

COMPLAINT FOR DAMAGES AND JURY DEMAND
*Burke and Maravilla v. Wells Fargo Bank, N.A.,*
Case No.

25.     The Federal Fair Housing Agency ("FHA") is an agency within the United States Department of Housing and Urban Development ("HUD") that supplies mortgage insurance to FHA-approved lenders, insuring loans on single-family homes.

26.     Mortgage insurance protects lenders from the risk of borrower defaults because the FHA agrees to pay lenders in the event of borrower default.

27.     Lenders must be pre-approved to qualify for FHA mortgage insurance. They must also comply with HUD regulations.

28.     Defendant is a pre-approved lender who qualifies for FHA mortgage insurance. Defendant is therefore required to comply with HUD regulations.

29.     For loans that are protected by FHA mortgage insurance, Defendant and the borrower(s) executed loan documents that incorporate by reference HUD regulations.

30.     In 2008, the federal government began the Troubled Asset Relief Program (TARP). Pursuant to TARP, all servicers that receive funding from TARP must participate in HAMP.

31.     Defendant received about $25 billion in TARP funds. In return, Defendant agreed to participate in HAMP and to be obligated by all Program Documentation (defined below).

32.     In 2009, the Secretary of the Treasury implemented the FHA HAMP, which was designed to minimize foreclosures by incentivizing loan modifications. Pursuant to HAMP, HUD has promulgated HAMP guidelines, regulations, and directives.

COMPLAINT FOR DAMAGES AND JURY DEMAND
*Burke and Maravilla v. Wells Fargo Bank, N.A.,*
Case No.

33.     Defendant is required to comply with all Program Documentation, HAMP, and other Department of Treasury directives.

34.     Among other things, Defendant is required to review defaulted loans for modification eligibility prior to proceeding with any foreclosure. Defendant is required to offer to all defaulted borrowers modifications for which they are eligible prior to conducting any foreclosure. HAMP guidelines require that Defendant undertake a number of specific and non-discretionary steps to determine a consumer's eligibility for modification or other relief. If, after completing a formula-driven net present value analysis, the modified loan would be more profitable than the non-modified loan, HAMP guidelines require that Defendant offer a trial period plan modification. If the borrower completes the trial period plan, Defendant is required to permanently modify the loan.

35.     To request a modification, the GSE ("government sponsored enterprise," such as Fannie Mae and Freddie Mac) Published Guidelines and FHA regulations require each borrower to submit standardized form assistance applications, financial worksheets, hardship affidavits, and acknowledgment and agreements (the "Modification Contract"). Pursuant to the standard form Modification Contract, the borrower makes a legal representation as to the material truth of all information provided. The borrower agrees to provide all requested financial and hardship information. Among other things, the borrower also promises to undergo credit counseling if they are so requested. In return, Defendant agrees in the Modification Contract to examine the borrower's eligibility for all available modifications. If the

borrower is eligible for any available mandatory modifications, Defendant is required by the Modification Contract (as well as HAMP, other Department of Treasury directives, FHA regulations, and binding GSE guidelines) to extend a trial period plan.[1]

36.    These standardized Modification Contracts incorporate all applicable obligations in the HAMP provisions, regulations, directives, guidelines, procedures, documentation, instructions, bulletins, frequently asked questions, letters, directives, and other communications issued by the Department of Treasury, GSEs, and federal agencies (collectively, "Program Documentation.").

37.    In all relevant communications with borrowers, Defendant represents that it will extend trial period plans to any borrower who is eligible for a mandatory modification under GSE guidelines and the HAMP.

38.    Defendant receives incentive payments for every successful modification under the Program Documentation. However, Defendant also benefits from unsuccessful modifications, along with foreclosures. If a federally mandated modification is not required, Defendant can offer modification and temporary payment plans outside of HAMP, often under terms that are less favorable to the borrower than federally mandated plans. Furthermore, Defendant can continue to obtain foreclosure, late fees, property inspection, preservation, and broker opinion

---

[1] In some circumstances, the Fannie Mae, Freddie Mac and FHA regulations and guidelines require lenders like Wells Fargo to evaluate borrowers who do not submit applications using the same criteria as for the underwritten applications, except for the consideration of the borrower's income. Some of these "Streamlined" modifications may also have been impacted by the software errors.

fees. What is more, Defendant receives higher float interest payments for non-modification options such as a short sale or a foreclosure. It further receives higher principal balance pool payments if it does not reduce the principal balance pursuant to Program Documentation requirements.

    **C.**    **Defendant repeatedly fails to oversee, test, and audit its uniform loan servicing, mortgage modification, and foreclosure practices.**

39.    In 2010, the Office of Comptroller of the Currency ("OCC") discovered multiple deficiencies and unsafe and unsound practices in Defendant's residential mortgage servicing, modification, and foreclosure programs. The OCC determined that Defendant failed to oversee, audit, and test its foreclosure and modification tools and practices and failed to comply with applicable laws, prioritizing profits over compliance and causing substantial harm to consumers.

40.    The OCC's investigation and related investigations resulted in the Federal Reserve assessing millions of dollars in fines against Wells Fargo & Company.

41.    As a result, Defendant agreed to two consent orders with the OCC, committing to taking all necessary and appropriate steps to remedy the deficiencies and unsafe and unsound practices identified by the OCC. In the consent orders, Defendant agreed to form compliance committees and programs subject to the oversight of the OCC. It agreed to adopt processes to better oversee, audit, and conduct ongoing testing of its loan servicing, modification, and foreclosure tools and practices and ensure legal and regulatory compliance. Some such agreed processes

1   were targeted at better oversight, auditing, and testing of automated tools,

2   modification and foreclosure review, and fee assessments.

3       42.     But Defendant failed to remedy the deficiencies and unsafe and unsound

4   practices identified by the OCC. It failed to adopt adequate oversight, auditing, and

5   testing processes and programs. And it failed to detect and/or correct repeated and

6   systemwide servicing, modification, and foreclosure process errors.

7       43.     In 2015, the OCC again determined that despite a 2011 consent cease–

8   and–desist order, Defendant continued to fail to adequately oversee, audit, and test

9   its servicing, modification, and foreclosure practices for compliance. As a result, the

10  OCC assessed additional millions in monetary penalties against Defendant's parent

11  company, Wells Fargo & Company.

12      44.     In early 2018, the OCC discovered additional and ongoing compliance

13  and conduct failures in Defendant's loan servicing, modification, and foreclosure

14  programs and processes. The OCC determined that Defendant's deficiencies and

15  compliance failures constituted reckless and unsafe or unsound practices in violation

16  of federal law and that Defendant failed to implement and maintain an adequate

17  compliance risk management program. It found that Defendant failed to implement

18  adequate oversight, control, auditing, and testing of its servicing, modification, and

19  foreclosure programs and practices. The OCC also found that Defendant failed to

20  adequately report compliance concerns, compliance failures, and Defendant's efforts

21  to remedy them.

22

23

24

45.    As a result, Wells Fargo & Company and Defendant entered into a consent cease–and–desist order with the OCC, again agreeing to adopt system-wide compliance programs and oversight.

46.    The Federal Reserve also issued a consent cease–and–desist order in early 2018 restricting Defendant's growth until governance, oversight, risk management, auditing, and testing were improved. In its order, the Federal Reserve reports that it determined Defendant "pursued a business strategy that emphasized sales and growth without ensuring that senior management had established and maintained an adequate risk management framework commensurate with the size and complexity of the Firm, which resulted in weak compliance practices."

47.    As a result of the OCC's continued investigations and resulting consent orders, Defendant was and is on notice of serious errors, deficiencies, and unsafe and unsound practices in its loan servicing, modification, and foreclosure processes and practices from 2010 through the present. Defendant was and is likewise aware of the need for oversight, testing, and auditing of those processes and practices, including the need for oversight, testing, and auditing of automated tools. Yet Defendant has habitually failed to adopt adequate oversight, testing, and auditing.

**D.    Defendant's automated calculation errors.**

48.    Defendant's deficiencies, unsafe and unsound practices, and failure to conduct adequate oversight, auditing, and testing, resulted in a number of systemic automated calculation errors that greatly affected borrowers.

49.    From 2010 through 2019, Defendant utilized automated mortgage loan modification underwriting tools to determine which default borrowers are qualified for a mortgage loan modification or repayment plan.

50.    By its own admissions, Defendant repeatedly failed to test and audit its automated mortgage loan modification underwriting tool, despite the OCC investigations and consent decrees putting it on notice of significant issues with its mortgage practices. Defendant likewise failed to adequately verify that its automated mortgage loan modification tools and standard foreclosure practices complied with consent decree requirements, regulations, and laws.

51.    As a result, Defendant wrongfully failed to approve hundreds of borrowers for appropriate mortgage loan modifications and/or repayment plans.

**E.    Defendant's "first" automated calculation error.**

52.    As a result of its continuing failure to implement adequate oversight, auditing, and test controls, Defendant failed to timely identify a number of automated calculation errors in its mortgage software.

53.    As reported by the OCC, between March of 2013 and October of 2014, an unidentified error caused Defendant to fail to offer modifications to at least 184 borrowers who were entitled to modification trial period plans.

**F.    Defendant's "second" automated calculation error.**

54.    Unbeknownst to the OCC, the plaintiffs and putative class members, Defendant's "first" automated calculation error was not its only one.

COMPLAINT FOR DAMAGES AND JURY DEMAND
*Burke and Maravilla v. Wells Fargo Bank, N.A.,*
Case No.

55.    On August 3, 2018, Wells Fargo & Company issued its Quarterly Report Pursuant to Section 13 or 15(d) of the Securities Exchange Act of 1934 (Form 10-Q) (August 3, 2018) ("August Report"). In its report (p. 3), Wells Fargo & Company revealed for the first time that it identified an automated calculation error that caused it to wrongfully deny loan modifications, which resulted in hundreds of foreclosures of residential mortgage loans in default between April 13, 2010, and October 20, 2015:

> An internal review of the Company's use of a mortgage loan modification underwriting tool identified a calculation error that affected certain accounts that were in the foreclosure process between April 13, 2010 and October 20, 2015, when the error was corrected. **This error in the modification tool caused an automated miscalculation of attorneys' fees that were included for purposes of determining whether a customer qualified for a mortgage loan modification** pursuant to the requirements of government-sponsored enterprises (such as Fannie Mae and Freddie Mac) and the U.S. Department of Treasury's Home Affordable Modification Program (HAMP). Customers were not actually charged the incorrect attorneys' fees. **As a result of this error, approximately 625 customers were incorrectly denied a loan modification or were not offered a modification in cases where they would have otherwise qualified. In approximately 400 of these instances, after the loan modification was denied or the customer was deemed ineligible to be offered a loan modification, a foreclosure was completed.**

(Emphasis added).

56.    Defendant's August Report demonstrates that Defendant's loan modification underwriting tool utilized an automated calculation error for more than five years before it was corrected.

57.    During those five years, Defendant wrongfully reported inaccurate information to credit reporting agencies regarding the residential mortgage loans of

consumers affected by its calculation error. Namely, Defendant reported to credit reporting agencies that borrowers were in default on their residential home loans, when, in reality, they were wrongfully prohibited from modifying their mortgage payments.

58.    During those five years, Defendant also wrongfully foreclosed on the homes of many of the consumers affected by its calculation error—consumers who should have been offered loan modifications instead of facing foreclosure.

59.    Also, during those five years, on information and belief, Defendant issued periodic statements and notices in connection with consumers' residential home mortgage loans that contained inaccurate information as a result of the automated calculation error.

60.    Moreover, subsequent legal disclosures reveal that Defendant identified its "second" accounting error in August of 2013. Defendant's employees discovered the error and escalated the problem to senior management.

61.    It was not until October 2, 2015, that Defendant implemented new controls purporting to address the accounting error and also replaced its system with the LPS/Black Knight Desktop Application. Defendant did not disclose this accounting error to government regulators, the public, or affected borrowers until almost three years later, on August 3, 2018. Despite detecting this error, Defendant concealed it from the public and the OCC, likely in an attempt to avoid additional fines and further OCC supervision.

62.     Even after discovering the calculation error, Defendant continued to conduct foreclosures on the homes of borrowers negatively affected by its "second" calculation error.

63.     Even after discovering the calculation error, Defendant continued to issue inaccurate periodic statements and notices to affected borrowers.

64.     On or around August 2021, Defendant sent form letters ("Apology Letters") to consumers affected by its "calculation error." In these letters, Defendant informed each consumer that "Based on a recent review of this former account, we identified an issue with your request for a loan modification. When we considered you for a loan modification, you weren't approved, and we now realize that you should have been…This check is to compensate you for not being offered the earlier trial modification."

65.     Although Defendant's letters state that it "*now* realize[s]" (emphasis added) it has made an error causing it to wrongfully fail to approve the consumer's modification, Defendant's August Report demonstrates that it has known about the error since August of 2013.

66.     In its Apology Letter to the Plaintiffs, Defendant enclosed a payment of $35,000.00, an arbitrarily chosen modicum of the damages suffered by the Plaintiffs as a result of the Plaintiffs' failure to receive their modification offer and the subsequent short sale.

67.    The $35,000.00 payment to the Plaintiffs is insufficient to compensate the Plaintiffs for the damages caused by Defendant's unlawful actions and inactions as described herein.

68.    In short, Defendant's Apology Letters admit that it wrongfully failed to offer a loan modification, admit that its error caused consumers harm, admit that its error resulted in inaccurate negative reporting to consumer reporting agencies that it purportedly corrected, and admit that Defendant had done nothing before August 2021 to remediate consumers and correct inaccurate credit reporting.

**G.    Defendant's "third" automated error.**

69.    Despite being on notice of its automated calculation errors, discovered in 2013 and 2014, Defendant *still* failed to implement adequate oversight, auditing, and testing compliance controls. That failure resulted in additional automated errors causing Defendant to wrongfully refuse to provide modifications on hundreds of additional borrowers' homes.

70.    On November 6, 2018, Wells Fargo & Company issued its Quarterly Report Pursuant to Section 13 or 15(d) of the Securities Exchange Act of 1934 (Form 10-Q). ("November Report"). In its November Report (p. 3), Wells Fargo & Company disclosed for the first time a third set of related calculation errors affecting an additional 245 consumers, which was identified using a "subsequent expanded review." The November Report also indicates that the first accounting error was actually corrected on October 2, 2015 (as opposed to October 20, 2015, as stated in the August Report):

1

An internal review of the Company's use of a mortgage loan modification underwriting tool identified a calculation error regarding foreclosure attorneys' fees affecting certain accounts that were in the foreclosure process between April 3, 2010, and October 2, 2015, when the error was corrected. **A subsequent expanded review identified related errors regarding the maximum allowable foreclosure attorneys' fees permitted for certain accounts that were in the foreclosure process between March 15, 2010, and April 30, 2018, when new controls were implemented. Similar to the initial calculation error, these errors caused an overstatement of the attorneys' fees that were included for purposes of determining whether a customer qualified for a mortgage loan modification or repayment plan pursuant to the requirements of government-sponsored enterprises** (such as Fannie Mae and Freddie Mac), the Federal Housing Administration (FHA) and the U.S. Department of Treasury's Home Affordable Modification Program (HAMP). Customers were not actually charged the incorrect attorneys' fees. **As a result of these errors, taken together and subject to final validation, approximately 870 customers were incorrectly denied a loan modification or were not offered a loan modification or repayment plan in cases where they otherwise would have qualified. In approximately 545 of these instances, after the loan modification was denied or the customer was deemed ineligible to be offered a loan modification or repayment plan, a foreclosure was completed.** The Company has contacted a substantial majority of the approximately 870 affected customers to provide remediation and the option also to pursue no-cost mediation with an independent mediator. Attempts to contact the remaining affected customers are ongoing. Also, the Company's review of these matters is ongoing, including a review of its mortgage loan modification tools.

(Emphasis added).

71.    The November Report demonstrates that Defendant's loan modification underwriting tool suffered from the attorneys' fee calculation error for more than eight years.

72.    During those eight years, Defendant wrongfully reported inaccurate information to credit reporting agencies regarding the residential mortgage loans of

consumers affected by its calculation error. Namely, Defendant reported to credit reporting agencies that borrowers were in default on their residential home loans when in reality they were wrongfully prohibited from modifying their mortgage payments. And meanwhile, borrowers faced the consequences, including increased borrowing costs, loss of equity and the appreciation of their home, legal fees, devastating impacts to consumer credit, and incidental costs related to the sudden need to move.

73.    During those eight years, Defendant also wrongfully foreclosed on the homes of consumers affected by its calculation error—consumers who should have been offered loan modifications instead of facing foreclosure.

74.    Also, during those eight years, on information and belief, Defendant issued periodic statements and notices in connection with consumers' residential home mortgage loans that contained inaccurate information as a result of the automated calculation error.

75.    The November Report also admits that Defendant was aware of the accounting error on or before April 30, 2018. But Defendant did not disclose this accounting error to the public or affected borrowers until almost six months later, on November 6, 2018.

76.    Despite knowing that its automated errors harmed consumers (and admitting in its Apology Letter that it was appropriate to request consumer reporting agencies remove any negative reporting), Defendant made no effort before November

COMPLAINT FOR DAMAGES AND JURY DEMAND
*Burke and Maravilla v. Wells Fargo Bank, N.A.,*
Case No.

of 2018 to rescind the inaccurate and negative information reported to credit reporting agencies regarding consumers affected by the automated errors.

77.    Every additional week that a mortgagor spends in the "default zone" with regard to their mortgage materially and negatively affects the mortgagor's credit. Every additional week that a mortgagor is stuck in the "default zone" is another week where the mortgagor is limited in his/her ability to pay, purchase, buy, earn, rent, or maybe even obtain or continue gainful employment. Every additional week in this "default zone" is another week accruing damages that are more difficult to recover from each subsequent week.

78.    In Exhibit 13 to its March 2019 Report, Defendant disclosed that "[t]his effort to identify other instances in which customers may have experienced harm is ongoing, and it is possible that we may identify other areas of potential concern."

## V.    PLAINTIFFS' FACTUAL ALLEGATIONS

79.    On June 25, 2004, Plaintiffs entered into a Deed of Trust related to the Property of which the Defendant obtained both the servicing rights and the ownership rights as of August 25, 2005.

80.    Between April 2012 and May 2012, the Plaintiffs contacted the Defendant in anticipation of proposed default due to changes in the Plaintiffs' income.

81.    Following this call, Defendant advised Plaintiffs to submit an application for loss mitigation. Between May 2012 and March 2014, the Plaintiffs submitted at least one, if not multiple, facially complete applications for loss mitigation, which Defendant was required to review.

82.    Due to continued financial hardships, while the loss mitigation applications were pending, the Plaintiffs stopped making contractual mortgage payments in June 2013.

83.    Sometime in February 2014, the Plaintiffs received a letter from the Defendant notifying them that they were denied for a loan modification.

84.    Upon receipt of the February 2014 letter, the Plaintiffs contacted Defendant to discuss the denial and what, if any options, were available. Based upon both the March 15, 2014, letter and the phone call, the Plaintiffs reasonably believed that their only option was to sell the Property via short sale.

85.    On June 20, 2014, the Plaintiffs were forced to sell the Property in a short sale.

86.    As a result of Defendant's failure to modify Plaintiffs' loan, leading to the loss of their home, the Plaintiffs suffered significant mental anguish. They had to relocate to much smaller properties than the Property; their personal and professional relationships they, built over years in their community, suffered.

87.    Over seven years later, Defendant sent the Plaintiffs a form apology letter dated August 30. 2021. *See* Exhibit 1. The form Apology Letter inaccurately states that Defendant has just now realized that it committed an error, and that Plaintiffs should have been approved for a modification. The form Apology Letter acknowledges that Defendant's error affected Plaintiffs at a time when they were facing a hardship and that the Defendant was now seeking to "compensate" the Plaintiffs.

COMPLAINT FOR DAMAGES AND JURY DEMAND
*Burke and Maravilla v. Wells Fargo Bank, N.A.,*
Case No.

88.    This was the first time Plaintiffs learned that Defendant had committed a calculation error and that their modification should have been approved. Never in the years since being forced to sell the Property did Defendant attempt to discuss with the Plaintiffs its accounting error or its wrongful failure to provide mortgage assistance.

89.    Along with the Apology Letter, Defendant enclosed a check for $35,000.00. This payment is insufficient to compensate them for the harm they suffered, including the emotional distress, anger, frustration, and anxiety, as a result of Defendant's wrongful practices.

90.    Defendant's repeated refusal to provide mortgage assistance (to which the Plaintiffs were eligible), Defendant's refusal to correct its error after identifying its automated calculation errors, along with the loss of their home, caused Plaintiffs significant economic and non-economic damages.

## VI.    CLASS ACTION ALLEGATIONS

### A.    The Class Definition.

91.    **The Class:** Plaintiffs bring this action pursuant to Fed. R. Civ. P. 23(a) and (b)(1), on behalf of similarly situated individuals and entities ("the Class") defined as follows:

> All persons, as identified by Defendant constituting mortgagors for whom Defendant was the mortgagee or servicer, in the United States who between 2010 and 2018 (i) qualified for a home loan modification or repayment plan pursuant to the requirements of government-sponsored enterprises (such as Fannie Mae and Freddie Mac), the Federal Housing Administration (FHA), or the U.S. Department of Treasury's Home Affordable Modification Program (HAMP); and (ii) were not offered a

COMPLAINT FOR DAMAGES AND JURY DEMAND
*Burke and Maravilla v. Wells Fargo Bank, N.A.,*
Case No.

home loan modification or repayment plan by Defendant due to the calculation error referenced in the Apology Letter.

Excluded from this class are Defendant's officers, directors, and employees; the judicial officers and associated court staff assigned to this case; and the immediate family members of such officers and staff.

**B.    Fed. R. Civ. P. 23(a)(1): Numerosity.**

92.    Based upon mutually agreed-upon disclosures during the pendency of this action, the Plaintiffs have determined that the number of Class members will be 1,830 members. Class members can easily be identified through Defendant's records, or by other means.

93.    The definition of the Class is unambiguous, and Plaintiffs are members of the Class they seek to represent.

94.    Nevertheless, Plaintiffs reserve the right to amend or modify the Class definitions, for example, to create greater specificity, divide into additional subclasses, or limit particular issues as the case progresses.

95.    The Class is so numerous and geographically dispersed that joining all the Class members would be impracticable.

96.    Plaintiffs and the Class satisfy the requirements of Rule 23(b)(1)(A), (b)(1), and/or (b)(3).

**C.    Fed. R. Civ. P. 23(a)(2) and (b)(3): Commonality and Predominance.**

97.    Plaintiffs' claims are typical of the Class because Plaintiffs' claims have the same essential characteristics as all other Class members' claims and the evidence to establish the facts and claims stated herein will be the same for Plaintiffs

and all other members of the Class. All claims are based on the same course of conduct and similar legal theories. All Class members, including Plaintiffs, suffer the same types of injuries and possess the same interests in pursuing this case as do Plaintiffs. A single resolution of these claims would be preferable to a multiplicity of similar actions.

98.     There are common questions of law and fact subject to answers common to all Class members that predominate over any questions affecting only individual members, including but not limited to:

    a.  What calculation and related errors occurred in Defendant's mortgage loan modification underwriting tool and/or related software between 2010 and 2018?

    b.  What were Defendant's common policies and practices regarding its oversight, inspection, auditing, testing, review, repair, and control of automated loan modification tools and related software between 2010 and 2018?

    c.  What were Defendant's common policies and practices regarding the inspection, verification, and reporting of negative information to credit reporting agencies between 2010 and 2018?

    d.  What were Defendant's common policies and practices regarding rescinding or correcting negative information that was erroneously reported to credit reporting agencies between 2010 and 2018?

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

e.  How and when did Defendant discover errors in its automated loan modification tools and related software?

f.  What actions and/or disclosures did Defendant take and/or make each time it discovered errors in its automated loan modification tools and related software?

g.  When was Defendant on notice of the risk of errors in its automated loan modification tools due to inadequate oversight, auditing, and testing compliance mechanisms?

h.  Did Defendant undertake any effort to correct its erroneous reporting to credit reporting agencies prior to September of 2018?

i.  Did Defendant owe contractual obligations to Class members by failing to approve them for loan modifications or repayment plans for which they were qualified pursuant to the requirements of government-sponsored enterprises, the FHA, and HAMP?

j.  Did Defendant breach those contractual obligations?

k.  Was Defendant's conduct extreme and outrageous?

l.  Did Defendant intentionally, with substantial certainty, or with reckless indifference cause serious emotional harm to members of the Class?

m. Did Defendant conceal or misrepresent to members of the Class its automated calculation errors and/or their entitlement to loan modifications?

n.  Was any such concealment or misrepresentation material to members of the Class's loan modification?

o.  Did Defendant conceal or misrepresent material facts with knowledge of the facts' materiality and falsity and/or with such utter disregard and recklessness as to infer knowledge of its falsity?

p.  Was the Class members' property in active foreclosure at the time of the calculation error?

q.  Was the mortgage held by Wells Fargo paid in full by the Class member following an application for modification being denied due to the calculation error?

r.  Was the mortgage held by Wells Fargo service transferred and then had foreclosure initiated against the Class member within twelve months of the service transfer following an application for modification being denied due to the calculation error?

s.  Was the mortgage held by Wells Fargo satisfied via short sale proceeds from the class member following an application for modification being denied due to the calculation error?

t.  Was the Class members' mortgage subsequently modified by Wells Fargo following an application for modification being denied due to the calculation error?

COMPLAINT FOR DAMAGES AND JURY DEMAND
*Burke and Maravilla v. Wells Fargo Bank, N.A.,*
Case No.

1

**D.**     **Fed. R. Civ. P. 23(a)(3): Typicality.**

2      99.     The claims of the Plaintiffs are typical of the claims of the Class because

3 Defendant has acted or refused to act on grounds generally applicable to the Class,

4 thereby making it appropriate for the Court to render final relief regarding the Class

5 as a whole. For example:

6         a.   Plaintiffs were subject to a mortgage on a residential home mortgage

7             loan that was owned and/or serviced by Defendant on or after March 15,

8             2010.

9         b.   Plaintiffs' loans entered loss mitigation review on or after March 15,

10             2010.

11         c.   Plaintiffs qualified for mortgage loan modification trial period plans

12             pursuant to HAMP.

13         d.   Defendant improperly denied Plaintiffs appropriate loss mitigation

14             review and tools.

15         e.   That denial was a result of automated-calculation and related errors

16             pertaining to Defendant's use of mortgage loan modification and

17             underwriting tool. Had Defendant not based its decision on a faulty

18             calculation, Plaintiffs would have been approved for trial modifications.

19         f.   As such, Plaintiffs are members of the Class.

20      100.     Defendant's actions and inactions described above violated Plaintiffs'

21 and the Class's statutory and common law rights.

22

23

24

101.    Plaintiffs and all members of the Class have suffered damages as a result of Defendant's actions and inactions described above.

102.    Defendant's actions toward the Class and Plaintiffs are substantially similar, including: (1) Defendant's failure to approve Plaintiffs and the Class for temporary trial modification plans were the result of the same accounting and related errors, affecting the same calculation of attorneys' fees, effectuated using the same mortgage loan modification underwriting tool; (2) Defendant admits that had it not based its modification decision regarding Plaintiffs and members of the Class on a "faulty calculation" Plaintiffs and all members of the Class would have received trial modifications; (3) Defendant utilized common and uniform policies, forms, and procedures when considering Plaintiffs' and all Class members' loans for modification; and (4) Plaintiffs' claims are predicated on duties and actions identical to Defendant's duties and actions owed and taken in regard to all Class members' residential real property loans.

103.    A class action is superior to other available methods for resolving adjudication of the Class members' claims fairly and efficiently because:

    a.    It will avoid a multiplicity of suits and consequent burden on the courts and Defendant;

    b.    It would be virtually impossible for all members of the Class to intervene as parties-plaintiffs in this action;

c.     It would assure uniform application of the laws and a single, uniform decision across the board without sacrificing procedural fairness or bringing about other undesirable results;

d.     It will provide court oversight of the claims process, once Defendant's liability is adjudicated;

e.     It would permit a large number of similarly situated persons to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of effort and expense that numerous individual actions would engender; and

f.     It will permit the adjudication of relatively small claims by certain Class members, who could not afford to individually litigate such claims against a large corporate Defendant.

**E.     Fed. R. Civ. P. 23(a)(4): Adequacy of Representation.**

104.     Plaintiffs will fairly and adequately protect the interests of the Class.

105.     Plaintiffs come before this Court as victims of Defendant. They were the mortgagors of loans that were in default and serviced by Defendant. They were qualified for mortgage loan modification or repayment plans. But due to Defendant's calculation and other automated errors, they were wrongfully denied modification, and subsequently damaged.

106.     Plaintiffs' counsel will fairly and adequately prosecute the case on behalf of Plaintiffs and the Class.

COMPLAINT FOR DAMAGES AND JURY DEMAND
*Burke and Maravilla v. Wells Fargo Bank, N.A.,*
Case No.

107.    Plaintiffs' counsel are experienced trial attorneys who have engaged in extensive trial practice and have considerable experience in all aspects of class and mass tort litigation from several other class action and mass tort cases, including class action and mass tort cases against lenders and loan servicers.

108.    Plaintiffs' counsel have the necessary skills, expertise, and competency to adequately represent Plaintiffs' interests and those of the Class.

## VII.    TOLLING ALLEGATIONS FOR ALL CLAIMS

109.    The causes of actions alleged herein by the Plaintiffs against Defendant did not accrue or were tolled until the Plaintiffs discovered, or could have discovered with the exercise of reasonable diligence, the facts giving rise to their legal claims. Based upon the allegations contained herein the earliest any of the Plaintiffs could have learned of their claims was September 13, 2018.

110.    Based upon the allegations contained herein the Plaintiffs had no realistic possibility until receiving the Apology Letters to know that (a) they qualified for a loan modification and (b) they were denied wrongfully for a mortgage modification based on a miscalculation done by Defendant's automated decision-making tool that was (and remains) exclusively under the control of Defendant.

111.    Based upon the allegations contained herein the Plaintiffs had no realistic ability to discover any facts only known to Defendant regarding the wrongful denial for the mortgage modifications submitted between 2010 and 2015. Defendant's automated decision-making tool is not public, and the mathematical calculations used to determine eligibility for any mortgage modification depend solely on variables

COMPLAINT FOR DAMAGES AND JURY DEMAND
*Burke and Maravilla v. Wells Fargo Bank, N.A.,*
Case No.

within Defendant's exclusive control or information provided exclusively to Defendant.

112.    Based on all of the foregoing, any applicable statutes of limitations are also tolled by Defendant's knowing, active, and ongoing concealment of the facts alleged herein. Defendant discovered at least one, if not multiple, software errors back in August 2013 which contributed to the wrongful denial of loans modifications of the Plaintiffs, or any borrower similarly situated. Based on the allegations contained herein and each 10-Q issued by Wells Fargo & Company since August 2018, Defendant deliberately concealed any information regarding the wrongful denial until September 13, 2018. Defendant had a continuous duty to disclose the truth to the Plaintiffs and based upon the actions herein the Plaintiffs reasonably relied on Defendant's ongoing concealment until taking the actions to procure discovery described herein.

## VIII.  COUNT ONE

## BREACH OF FORM CONTRACT

113.    Plaintiffs incorporate by reference all other allegations of this Complaint as if fully restated herein.

114.    Plaintiffs and each member of the Class entered into a contract with Defendant. The terms of the contract are set forth in the uniform borrower assistance form and the Security Instruments underlying the mortgage, typically referred to as a mortgage, deed of trust, or security deed (collectively, except where inappropriate,

1  the "Form Contract"). The Form Contract is a standard form document containing

2  identical provisions as required by GSEs, HUD, and the HAMP.

3       115.   Although   HAMP   and   other   government-mandated   mortgage

4  modifications were promulgated after Plaintiffs and the other Class members entered

5  into the Form Contracts with Defendant, a reasonable interpretation of the Form

6  Contracts required Defendant to provide Plaintiffs and the Class members all

7  available options to cure a default at the time of default, which was after the effective

8  date of HAMP and other government-mandated mortgage modifications The Form

9  Contract impliedly incorporated the law as it existed during the period the contract

10  was in effect.

11       116.    The Form Contract required Plaintiffs and each member of the Class to

12  certify under penalty of perjury that the information provided was truthful, provide

13  authority to investigate their financial status, and agree to credit counseling (among

14  other things).

15       117.    Defendant agreed via the Form Contract to evaluate Plaintiffs and each

16  member of the Class for temporary payment plan or modification program in

17  compliance with the GSE, HUD, and HAMP requirements. Defendant agreed via the

18  Form Contract to offer Plaintiffs and each member of the Class the best temporary

19  payment plan or modification program for which they were eligible.

20       118.    The Form Contract governs the relationship between Plaintiffs and

21  members of the Class and Defendant with regard to a temporary payment plan and

22  modification programs pursuant to GSE, HUD, and HAMP requirements and

23

24

COMPLAINT FOR DAMAGES AND JURY DEMAND
*Burke and Maravilla v. Wells Fargo Bank, N.A.,*
Case No.

incorporates by reference those GSE, HUD, and HAMP requirements. The Form Contract is signed by Plaintiffs and each member of the Class. If Plaintiffs or a member of the Class missed a mortgage payment, Defendant was to send correspondence informing the mortgagor of the amount owed and inviting the mortgagor to call Defendant's "trained professionals" to help "determine the best option available" to the mortgagor. One such option was a loan modification, which could cure a default and bring a loan to "current" status.

119.    Plaintiffs and each member of the Class provided documents, information, and certifications in compliance with the Form Contract.

120.    Defendant was required under the Form Contract to consider Plaintiffs and each other Class member for a loan modification and to provide that loan modification if appropriate. Plaintiffs and each other member of the Class were eligible for a GSE, HUD, or HAMP temporary payment plan or loan modifications. But Defendant did not offer Plaintiffs or each member of the Class any temporary payment plan or loan modification. Defendant failed to do so because of a faulty automated calculation. Had that automated calculation been correct, Plaintiffs and each other member of the Class would have been approved for a trial modification. Defendant breached its obligations to Plaintiffs and each member of the Class under the Form Contract.

121.    Defendant's breach impacted Plaintiffs and other members of the Class at a time when they were experiencing extreme hardship. As a result of the faulty automated calculation, Defendant incorrectly provided negative credit information to

consumer reporting agencies. Plaintiffs and other members of the Class were not offered trial modifications and/or were offered less beneficial modification plans. Ultimately, Plaintiffs were damaged by Defendant's breach.

122.    Defendant also breached its duties under the Form Contract by failing to give Plaintiffs and each other Class Member adequate notice of the mortgage modification option.

123.    Defendant discovered its "first" automated calculation error on or before October 2, 2015. While Defendant states that it fixed the first automated calculation error on October 2, 2015, it failed to disclose the error to the public until August 3, 2018, and failed to disclose the error to individuals it affected until September of 2018. Despite admitting its error and that its error caused Plaintiffs and members of the Class to suffer significant harm, Defendant did nothing for almost three years to mitigate the harm it caused to Plaintiffs and members of the Class, keeping the accounting error a secret. On information and belief, Defendant continued to fail to offer modification plans to Plaintiffs and other members of the Class after discovering its automated calculation error. By using a defective automated calculation process, and by delaying notification of the errors by three years, Defendant breached the duty of good faith and fair dealing it owed to Plaintiffs and other members of the Class.

124.    Defendant discovered its "second" automated calculation error on or before April 30, 2018. While Defendant states that it "implemented new controls" on April 30, 2018, it failed to disclose the error to the public until November 6, 2018. Despite admitting its error and that its error caused Plaintiffs and members of the

Class to suffer significant harm, Defendant has done nothing to mitigate the harm it caused to Plaintiffs and members of the Class. By continuing to use a defective automated calculation process and by delaying notification of the errors, Defendant again breached the duty of good faith and fair dealing it owed to Plaintiffs and other members of the Class.

125.    Plaintiffs and members of the Class were injured by Defendant's breach of the Form Contract and suffered damages. In sending out Apology Letters to Plaintiffs and other Class members, Defendant admitted the breach; the only question that remains, therefore, is the amount of damages, which is to be proven at trial.

## IX.    COUNT TWO

## BREACH OF THE FORM CONTRACT'S IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING

126.    Plaintiffs incorporate by reference all other allegations of this Complaint as if fully restated herein.

127.    The members of the Class entered into a contract with Defendant. The terms of the contract are set forth in the uniform borrower assistance form (the "Form Contract"). The Form Contract is a standard form document containing identical provisions as required by GSEs, HUD, and the HAMP.

128.    Every contract, including the Form Contracts at issue in this case, includes and imposes upon each party to that contract a duty of good faith and fair dealing in its performance and enforcement.

129.    Defendant agreed via the Form Contract to offer Plaintiffs and each member of the Class the best temporary payment plan or modification program for which they were eligible.

130.    The Form Contract governs the relationship between Plaintiffs and members of the Class and Defendant with regard to a temporary payment plan and modification programs pursuant to GSE, HUD, and HAMP requirements and incorporates by reference those GSE, HUD, and HAMP requirements. The Form Contract is signed by each member of the Class.

131.    Plaintiffs and each member of the Class provided documents, information, and certifications in compliance with the Form Contract.

132.    Defendant was, when necessary, required to consider Plaintiffs and each member of the Class for a loan modification. Plaintiffs and each member of the Class were eligible for a GSE, HUD, or HAMP temporary payment plan or loan modifications. But Defendant did not offer Plaintiffs or each member of the Class any temporary payment plan or loan modification. Defendant failed to do so because of a faulty automated calculation. Had that automated calculation been correct, Plaintiffs and each member of the Class would have been approved for a trial modification. Defendant breached the implied covenant of good faith and fair dealing with Plaintiffs and each member of the Class under the Form Contract.

133.    Defendant's breach of the implied covenant of good faith and fair dealing impacted Plaintiffs and members of the Class at a time when they were experiencing extreme hardship.

134.    Moreover, Defendant covered up its breaches even after it discovered the defects in the automated calculation program Defendant discovered its "first" automated calculation error on or before October 2, 2015. While Defendant states that it fixed the first automated calculation error on October 2, 2015, it failed to disclose the error to the public until August 3, 2018, and failed to disclose the error to individuals it affected until September of 2018. Despite admitting its error and that its error caused Plaintiffs and members of the Class to suffer significant harm, Defendant did nothing for almost three years to mitigate the harm.

135.    Defendant discovered its "second" automated calculation error on or before April 30, 2018. While Defendant states that it "implemented new controls" on April 30, 2018, it failed to disclose the error to the public until November 6, 2018. Despite admitting its error and that its error caused Plaintiffs and members of the Class to suffer significant harm, Defendant taken insufficient action to mitigate the harm it caused to Plaintiffs and members of the Class.

136.    Defendant breached the duty of good faith and fair dealing it owed to Plaintiffs and members of the Class by failing to maintain adequate procedures in support of its automated modification eligibility review programs and by covering up the errors.

137.    Plaintiffs and other members of the Class were injured by Defendant's breach of the duty of good faith and fair dealing and suffered damages in an amount to be proven at trial.

COMPLAINT FOR DAMAGES AND JURY DEMAND
*Burke and Maravilla v. Wells Fargo Bank, N.A.,*
Case No.

# X.    COUNT THREE

## FRAUD AND FRAUDULENT CONCEALMENT

138.    Plaintiffs incorporate by reference all other allegations of this Complaint as if fully restated herein.

139.    Defendant misrepresented to Plaintiffs and members of the Class their eligibility for modification options. Moreover, Defendant actively and knowingly concealed for years its automated calculation errors. On information and belief, despite discovering those errors, Defendant continued to conduct foreclosures and issue notices of default regarding properties and consumers affected by those errors.

140.    Plaintiffs' and other Class members' modification eligibility was of the utmost importance to them. Their eligibility for modification—as well as the automated errors erroneously determining them to be ineligible for modification—were material to Plaintiffs and other members of the Class.

141.    Defendant was on notice since as early as 2010 of seriously deficient, unsafe, and unsound practices in its loan servicing, modification, and foreclosure programs. Despite committing, in multiple consent cease-and-desist orders, to correct these defects, Defendant failed to adopt adequate controls, including necessary oversight, auditing, and testing procedures. In short, despite repeated reminders of its erroneous servicing, modification, and foreclosure practices and tools, Defendant elected to put profits and growth over compliance.

142.    By wrongfully communicating to Plaintiffs and members of the Class their purported ineligibility for loan modifications and by actively concealing from

COMPLAINT FOR DAMAGES AND JURY DEMAND
*Burke and Maravilla v. Wells Fargo Bank, N.A.,*
Case No.

them, the public, and government regulators known calculation tool errors and compliance deficiencies, Defendant intended to provoke reliance of Plaintiffs and other members of the Class on Defendant's misrepresentations and omissions.

143. Plaintiffs and other members of the Class relied on Defendant's misrepresentations and omissions. That reliance was justified, particularly given that Defendant exclusively had in its power all of the tools necessary to determine eligibility for mortgage modification. Plaintiffs and other members of the Class had neither the sophistication nor tools to check Defendant's misrepresentations and omissions regarding their mortgage modification eligibility and calculations.

144. Defendant's conduct proximately caused Plaintiffs' and other members of the Class injury, resulting in damages in an amount to be proven at trial.

145. Defendant's misconduct was so oppressive, malicious, and fraudulent as to justify imposition of punitive damages.

## XI.    COUNT FOUR

### INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

146. Plaintiffs incorporate by reference all other allegations of this Complaint as if fully restated herein.

147. Defendant engaged in extreme and outrageous conduct. It repeatedly failed to oversee, audit, and test its servicing, modification, and foreclosure practices, including its automated calculation software. It then used that automated calculation software to make automated decisions about offering modifications and whether or not its customers could keep their family homes. As a result of repeated federal

1  investigations, fines, and consent cease-and-desist orders, Defendant was on notice

2  of its own deficient, unsafe, and unsound practices. Yet it allowed material errors in

3  its software to persist for years, affecting hundreds of borrowers and causing the

4  unnecessary foreclosure of hundreds of homes.

5          148.    Despite discovering its automated calculation errors no later than 2015,

6  Defendant concealed its errors from government regulators and the public until 2018,

7  when it was subjected to yet another consent cease-and-desist order. As the Federal

8  Reserve determined, Defendant prioritized profits and growth over compliance.

9          149.    As a result of Defendant's long-term actions and inactions, Plaintiffs and

10 the other Class members suffered severe emotional distress. Thus,

11 contemporaneously with Defendant receiving billions in HAMP funds from the U.S.

12 Government, Defendant systematically injured Plaintiffs and the Class through

13 HAMP modification denials stemming from Defendant's reckless and heartless

14 coverups of known and yet unmitigated errors.

15         150.    Defendant knew or should have known that by denying Plaintiffs and

16 the other Class members a loan modification, its conduct would result in serious

17 emotional distress to Plaintiffs and the other Class members, as the loss or potential

18 loss of a home is an emotionally significant event.

19         151.    Defendant's reckless disregard for such emotional distress was beyond

20 all possible bounds of decency and completely intolerable in a civilized community.

21         152.    The U.S. Government's creation of HAMP and other loan modification

22 programs show that it intended for no person in a situation similar to Plaintiffs and

23

24

the other Class members to have to endure what Defendant forced Plaintiffs and the other Class members to endure.

153.    Defendant's conduct was intentional and evidences a callous and reckless disregard for the rights of its customers and the risk its actions posed to its customers.

154.    Defendant's intentional extreme and outrageous conduct proximately caused Plaintiffs' and members of the Class's emotional distress and damages, in an amount to be proven at trial.

155.    Defendant's misconduct was so oppressive, malicious, and fraudulent as to justify imposition of punitive damages.

## XII.    COUNT FIVE

## GROSS NEGLIGENCE AND/OR NEGLIGENCE

156.    Plaintiffs incorporate by reference all other allegations of this Complaint as if fully restated herein.

157.    Defendant had an obligation to ensure that the information and statements it reported to credit reporting agencies were true and accurate. Defendant had a duty to Plaintiffs and the members of the Class to report fair, honest, and accurate information to the credit reporting agencies.

158.    Defendant made statements to the credit reporting agencies regarding the Plaintiffs and other members of the Class that were derogatory to their credit. The negative and derogatory information reported by Defendant to the credit

reporting agencies was that the Plaintiffs and members of the Class had experienced a foreclosure or other negative event related to their mortgages.

159.    When Defendant made these negative and derogatory statements about Plaintiffs, it knew or reasonably should have known that the statements were false and/or inaccurate, as they were based upon Defendant's own miscalculations.

160.    The reporting of a negative event related to a mortgage ("negative event") has a serious detrimental effect on one's credit. The reporting of a foreclosure is taken as an indication of poor creditworthiness. The reporting of a foreclosure or other negative event reduces one's credit score between 85 to as much as 160 points.

161.    Defendant's reporting of a negative event against the Plaintiffs and other members of the Class had a serious and detrimental effect upon their credit and creditworthiness, including substantially reducing their credit scores.

162.    The effect of Defendant's reporting of a negative event against the Plaintiffs and other members of the Class was not transitory. Upon information and belief, negative events can remain on a consumer's credit report for seven years. Defendant's reporting of a negative event against the Plaintiffs and the other members of the Class therefore resulted in long-term damage to their credit, creditworthiness, and credit scores.

163.    Defendant's reporting of a negative event regarding the Plaintiffs and the other members of the Class was untrue or, in the least, required additional information so as to make the reporting of a negative event not misleading. The

1    communication of a negative event created a false impression that would have been

2    contradicted by the inclusion of correct, omitted facts.

3        164.   Defendant concedes that the negative events were not correct and that,

4    at the least, Plaintiffs and other members of the Class should have been approved for

5    a trial modification that could have avoided the negative event. The reporting of a

6    negative event was false or at least gave a misleading impression that would have

7    been contradicted by including the omitted facts of the circumstances.

8        165.   Defendant wrote to Plaintiffs and the other members of the Class,

9    showing the untrue and misleading nature of the reporting of a negative event, as

10    follows: "We have some difficult news to share. When you were considered for a loan

11    modification, you weren't approved, and now we realize that you should have been."

12        166.   Defendant's reporting of a negative event was reckless, or at least

13    negligent, at the time that it was made and, upon information and belief, at least by

14    2013 the reporting of a negative event was knowingly false. Yet, Defendant failed to

15    take any action to correct its false statements and allowed reports of a negative event

16    that it knew to be false to tarnish the credit of the Plaintiffs and other members of

17    the Class for years.

18        167.   Defendant thereby acted recklessly and maliciously in that, upon

19    information and belief, Defendant knew or should have known that there were flaws

20    in its mortgage modification application software as early as 2011 and before the time

21    it foreclosed upon or initiated other negative events related to the homes of Plaintiffs

22    and other members of the Class..

23

24

COMPLAINT FOR DAMAGES AND JURY DEMAND
*Burke and Maravilla v. Wells Fargo Bank, N.A.,*
Case No.

168.   The OCC and the Board of Governors of the Federal Reserve warned Defendant and its parent in 2011 that, *inter alia*, the Bank was engaged in "unsafe or unsound practices in residential mortgage servicing and in the Bank's initiation and handling of foreclosure proceedings." The Comptroller advised the Bank that it had failed to devote sufficient resources to the administration of its foreclosure processes, failed to perform adequate oversight, risk management, and audit of those processes, and failed to adequately oversee third-party vendors. The Comptroller specifically required the implementation of "processes to ensure that all fees, expenses, and other charges imposed on the borrower are assessed in accordance with the underlying mortgage note" and applicable legal requirements. Therefore, by the time of the negative events relating to the homes of Plaintiffs and other members of the Class, Defendant was on notice to correct deficiencies with respect to the calculation of fees charged to borrowers. Its failure to do so was reckless and malicious.

169.   Furthermore, upon information and belief, Defendant knew that there were flaws in its mortgage modification application software as early as 2013, which specifically resulted in the sort of erroneous denials of modifications at issue in this case. Defendant's internal documents show that the software error at issue here were reported to Defendant and known within the organization by at least 2013. Upon information and belief, Defendant therefore knew or should have known that it had wrongly denied applications for mortgage modifications by that time.

170.    Once Defendant knew or should have known that it had wrongly denied applications for mortgage modifications, Defendant's report of the Plaintiffs' and other Class members' negative events to credit reporting agencies was not only recklessly untrue, but willfully so. At that point, Defendant was required to disclose information or to make corrective statements to cure the false impression that the Plaintiffs and other members of the Class had been subject to negative events.

171.    Defendant's statements to credit reporting agencies with respect to the negative events of the Plaintiffs and other members of the Class were both recklessly malicious at the time they were made, and willfully malicious once Defendant knew or should have known that it had wrongly denied applications for mortgage modifications. Defendant's report that the Plaintiffs and members of the Class had experienced negative events related to a mortgage was thus a communication made with malicious and/or willful intent not subject to preemption by the Fair Credit Reporting Act.

172.    Further, Defendant willfully, or at least recklessly, failed to correct its statements regarding the Plaintiffs and members of the Class, and to correct the wrong information that it had provided to the credit reporting agencies. It did this with the knowledge of the serious impacts this inaction would have on the Plaintiffs and other members of the Class.

173.    The Plaintiffs and other members of the Class were left to deal with the negative events reported on their credit report and to explain the negative events to

future mortgage lenders for the rest of their lives. A burden they would have avoided but for Defendant's misconduct.

174.    As a result of Defendant's statements affecting their credit, Plaintiffs and members of the Class suffered damages in an amount subject to proof, including loss of time and money spent in efforts to repair their credit; loss of favorable interest rates or other favorable loan terms; damage to credit; opportunity costs due to damaged credit or higher costs of borrowing.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs demand judgment against Defendant Wells Fargo Bank, N.A. as follows:

A.    For an Order Certifying the Class, appointing Plaintiffs as Representatives of the Class and Plaintiffs' counsel as Class Counsel;

B.    For entry of judgment in favor of Plaintiffs and the other members of the Class against Defendant for damages in an amount to be proven at trial, including statutory, treble, and/or punitive damages in accordance with applicable law.

C.    For entry of judgment in favor of Plaintiffs and the other members of the Class against Defendant for reasonable attorneys' fees and costs.

D.    For entry of judgment in favor of Plaintiffs and the other members of the Class for pre-judgment interest on all damages; and

E.    For such other and further relief as the Court deems just and equitable.

1

## <u>JURY DEMAND</u>

2

Plaintiffs demand a trial by jury on all counts so triable.

3

Respectfully submitted,

4

By: /s/Mitchell Chyette

Mitchell Chyette, State Bar No. 113087

5

Law Office of Mitchell Chyette

125 12th Street, Suite 100-BALI

6

Oakland, CA 94607-3699

(510) 388-3748 telephone

7

(510) 680-3760 facsimile

*mitch@chyettelaw.com*

8

9

Marc E. Dann (OH #0039425)*

Brian D. Flick (OH #0081605)*

**DannLaw**

10

15000 Madison Avenue

Lakewood, OH 44107

11

Office: (216) 373-0539

Facsimile: (216) 373-0536

12

Email: notices@dannlaw.com

13

*Pro Hac Vice Application to be submitted

*Counsel for Plaintiffs Lawrence Maravilla,*

14

*Amy Burke, and the Putative Class*

15

16

17

18

19

20

21

22

23

COMPLAINT FOR DAMAGES AND JURY DEMAND

*Burke and Maravilla v. Wells Fargo Bank, N.A.,*

Case No.

24

# EXHIBIT 1



Wells Fargo Home Mortgage
Return Mail Operations PO Box 10422
Des Moines, IA 50306-0422

August 30, 2021

Subject: Review of your loan modification application
Former mortgage account number: ▓▓▓▓▓▓▓0591
Property Address: 10368 BEXHILL PL
TRUCKEE, CA 96161

Dear LAWRENCE MARAVILLA & AMY BURKE:

Based on a recent review of this former account, we identified an
issue with your request for a loan modification. When we considered
you for a loan modification, you weren't approved, and we now realize
that you should have been.

We apologize that this happened. We've carefully considered what we
can do for you.

**You'll find a payment enclosed for $35,000.00.**
- This check is to compensate you for not being offered the earlier
  trial modification. We completed an individual review of your
  account to arrive at this amount.
- This payment is in addition to any refunds we may have previously
  sent.

**Tax information**
Wells Fargo may be required to report some of this payment amount to
the IRS. You may be responsible for any federal, state, or local tax
obligations associated with a portion of this payment. We recommend
consulting with your tax advisor if you have any questions about
potential tax liability or form 1098 or 1099 you may receive.

**We've also asked the consumer reporting agencies to delete the
tradeline. This means that we've asked them to remove the information
about this debt from your credit report.**
- Please note, corrections may take 60 days or more.
- If you have any questions about your credit report, please contact
  the consumer reporting agencies below. You can also access your
  free annual credit report at annualcreditreport.com.

Experian, PO Box 2002, Allen, TX 75014
experian.com

Equifax, PO Box 740241, Atlanta, GA 30375
equifax.com

TransUnion, PO Box 1000, Chester, PA 19017
transunion.com

Innovis, PO Box 1689, Pittsburgh, PA 15231
innovis.com

**We're here to help**

If you have questions, please call us at 1-877-880-9455, Monday through Friday, 8:00 a.m. to 5:00 p.m., Central Time. For customers with hearing or speech disabilities, we accept telecommunications relay service calls. We have representatives who speak Spanish. If you prefer to hear a full Spanish translation of this letter, please call us.

**Estamos aquí para ayudar**

Si tiene preguntas, llámenos al 1-877-880-9455, de lunes a viernes, de 8:00 a.m. a 5:00 p. m., hora central. Para los clientes con alguna discapacidad auditiva o del habla, aceptamos las llamadas de servicio de retransmisión de telecomunicaciones. Contamos con representantes que hablan español. Si prefiere escuchar la traducción completa al español de esta carta, llámenos.

Sincerely,

Wells Fargo Customer Care

Enclosure

SHRP 7741893
RL837d

Wells Fargo Home Mortgage is a division of Wells Fargo Bank, N.A.
© 2021 Wells Fargo Bank, N. A. All rights reserved. NMLSR ID 399802

